New Jersey Department of Labor,
Workmen's Compensation Bureau.

MYRTLE E. HUNTER, PETITIONER, v. ATLANTIC CITY ELECTRIC COMPANY, RESPONDENT.

For the petitioner, *William Elmer Brown, Jr.*

For the respondent, *Ralph N. Kellam.*

The petition is filed by Myrtle E. Hunter against Atlantic City Electric Company, a corporation, engaged in electric light and power business at Atlantic City, New Jersey, for compensation, burial expenses, &c., under the provisions of the Workmen's Compensation act of New Jersey, its amendments and supplements.

Said Myrtle E. Hunter was the wife of William J. Hunter, Jr., on February 21st, 1928, both living together, and she, together with two children of the marriage, viz., Myrtle Phyllis Hunter, born April 4th, 1924, and William J. Hunter, 3d, born December 19th, 1925, were dependent upon said William J. Hunter, Jr., for their maintenance. Said William J. Hunter, Jr., was, at that time and for several years previous, in the employ of the Atlantic City Electric Company, working as a construction engineer. On or about December 27th, 1927, he was assigned by his employer to the task of surveying and clearing the title to a large tract of land, known as the Deep Water Tract, near Salem, New Jersey, where said company contemplated the erection of a large power plant. Said Hunter was in full charge of said work. He was instructed to proceed with the work in such manner as he saw fit and to accomplish the conclusion thereof at the earliest possible time. He had no particular working hours assigned to him but was expected to work at any time, either day or night, when it seemed to the advantage of his employer that he should. In his work he was called upon to search public records of land titles, survey property lines, compute surveys, compile records, make reports, &c. The company

secured two rooms in the Johnson Hotel at Salem, one of which was used by Hunter as an office and the other as living quarters where he might stay when he was unable to get to his home at Hammonton, New Jersey. Hunter was assisted in his work by one Russell Johnson, whose principal duty was to survey said tract. The company supplied an automobile to Hunter for use in his work, the cost of up-keep and repair of which was borne by it. Hunter had no particular place where he was required to report each day nor where he was required to store said automobile. He was accustomed to use said automobile to go from his place of employment to his home and back again, and from the testimony adduced at the hearing, it would seem that his employer intended that it should be so used. At least such use of said automobile had the approval and sanction of said company and it knew that it was being so used.

The testimony also disclosed that Hunter very often worked during the evening hours and on holidays in the interest of his employer. The day following the accident was a legal holiday. Legal holidays did not necessarily mean leisure hours for Hunter. It further appeared that he had worked on the business of his employer at his home in the evenings, as well as at other times. All this was with the knowledge and assent of his employer.

At or about three-thirty in the afternoon of February 21st, 1928, said Hunter was at the Johnson Hotel, Salem, New Jersey, where he received from said Russell Johnson a survey which he, Johnson, had just completed. Before Johnson could proceed further with his work it was necessary that Hunter should compute said survey. To do that a book of logarithms was required. Such a book, belonging to Hunter, was at the respondent company's office at Swedesboro, New Jersey. Hunter went to Swedesboro in his employer's automobile, obtained the book and left there at about six-fifteen P. M. of said day. From there he started for his home at Hammonton. While on his way home he met with an accident and was killed. He was found pinned under said automobile, which was overturned in a ditch or creek at a point

near Folsom, New Jersey, beside the road leading from Buena Vista to Hammonton. The book of logarithms, identified as that which Hunter had gotten at Swedesboro, was also found in said car. It is admitted that Hunter met his death by reason of said accident. Respondent employer had notice thereof shortly after. The weekly wages of deceased were $51.50. Respondent contends that the decedent did not receive the injury, which caused his death, in an accident arising out of and in the course of his employment.

In *Bolos* v. *Trenton Fire Clay, &c., Co.*, 102 *N. J. L.* 479, it was said that "an accident arises in the course of the employment if it occurs while the employe is doing what a man so employed may reasonably do within a time during which he is employed, and at a place where he may reasonably be during that time" * * * "an accident arises out of the employment when it is something the risk of which might have been contemplated by a reasonable person, when entering the employment, as incidental to it." * * * "A risk is incidental to the employment when it belongs to or is connected with what a workman has to do in fulfilling his contract of service." * * * "A risk may be incidental to the employment when it is either an ordinary risk directly connected with the employment, or an ordinary risk which is only indirectly connected with the employment owing to the special nature of the employment."

It has also been held by our courts that for an accident to arise out of an employment, it is not necessary that the employment be the proximate cause of the accident; it is enough if the employment be a cause in the sense that but for the employment the accident would not have happened. *Terleck's* v. *Strauss*, 85 *N. J. L.* 454; *Hanglin* v. *Swift Co.*, 37 *N. J. L. J.* 81.

From the facts as they appeared in this case, it is reasonable and warrantable to assume that at the time when Hunter met with the accident which caused his death, he was on his way home where he intended to compute the survey made by Johnson in order that he, Johnson, might proceed with his work without interruption at the beginning of the day fol-

lowing the holiday. It is justifiable, therefore, to conclude that Hunter's death was due to an accident which arose out of and in the course of his employment.

But in addition to this, it was testified to that the decedent was on his way home in an automobile supplied him by his employer for use, among other things, in conveying him to and from his work; that he was given the privilege to so use it; that it was so used with his employer's knowledge and sanction; that he might conclude his day's work upon arrival at his home or any other place where he might choose; and that such use was to the mutual advantage of himself and his employer. Under such circumstances it has been repeatedly held by our courts that the relation of master and servant exists. It must, therefore, be said that an accident occurring while such relationship exists did arise out of and in the course of employment.

In *Dunbaden* v. *Castles Ice Cream Co.*, 5 N. J. Mis. R. 63, it appeared from the testimony that one Grundman each day went from Newark to Perth Amboy, where his employer kept a four and one-half ton truck which Grundman used to transport ice cream made by the appellant, over a route on Staten Island for the purpose of selling it. Grundman received a commission on each gallon of ice cream he sold. At the end of his day's work Grundman would leave the truck at Perth Amboy. He would then take a Ford roadster, which was owned by his employer, and which he was permitted to use, and drive it to Newark, where he lived. The car was kept in an alley near his residence over night and then was driven by Grundman in the morning to Perth Amboy, where he would again use the truck for serving the Staten Island route. There was testimony that immediately after the accident Grundman said that he was on his way to the Newark plant of his employer. Mr. Justice Katzenbach, speaking for the Court of Errors and Appeals, said: "Even if this were not so and he was enroute home, we think the case is governed by the decision of this court in *Depue* v. *Salmon Co.*, 92 N. J. L. 550; 106 *Atl. Rep.* 379, which held that the relation of master and servant continues during the carriage of the

servant to and from his work when done by the master, or with his consent, where from the character of the service such transportation is beneficial both to the master and servant. The appellant seeks to distinguish this case from the present case because in the Depue case the servant was permitted to use the automobile and take it to his home at night in order to reach his place of employment earlier in the morning than he otherwise would, while in the present case there is nothing which makes it appear that it was necessary for Grundman to reach his work earlier than the ordinary business hour. This, it is argued, did not make the transportation of Grundman beneficial to his employer. The transportation, it is insisted, only benefitted Grundman. We are not impressed by this argument. It was beneficial to the appellant to have Grundman get to its Perth Amboy plant promptly for the service of his route. This could be better accomplished if Grundman had placed at his disposal an automobile with which to make the trip rather than be dependent upon the service of street railways and steam railroads with the delays incident to such travel. We see no difference in principal between the two cases."

In *Cicalese* v. *Lehigh Valley Railroad Co.*, 75 *N. J. L.* 897, 900; 69 *Atl. Rep.* 166, 167, it was held that where a railroad company provides handcars for the transportation of its employes from the place where they have been working to a point convenient to their homes, even if the journey is commenced after the usual work of the day has ceased, the relation of master and servant continues until the employe has reached the destination to which he is being carried by or with the consent of the company.

In *Fisher* v. *Tidewater Building Co.*, 114 *Atl. Rep.* 150, the plaintiff, an employe of the defendant company, was killed while on his way home after quitting work and while boarding a train provided by his employer. Mr. Justice Black, who wrote the opinion, held that: "Where a workman is employed to work at a certain place, and that as a part of his contract of employment there is an agreement that his employer shall furnish him free transportation to or from his

work, the period of service continues during the time of transportation, and if an injury occurs during the course of transportation, it is held to have arisen out of and in the course of employment."

In the case of *Gillshannon* v. *Stony Brook Railroad Co.*, 10 *Cush.* (*Mass.*) 228, which was cited with approval by our Court of Errors and Appeals in *Cicalese* v. *Lehigh Valley Railroad Co.*, *supra*, it appeared that plaintiff rode each morning and evening, with other laborers, to and from his work on a gravel train of the defendant, with its consent and for mutual convenience, no compensation being paid directly or indirectly by the laborers for passage, nor was the company under any contract to convey them to and from their work. The plaintiff was injured through the negligence of defendant's servant. On this state of facts the court held that if by the contract of service the plaintiff was to be carried by the defendant to the place where he was to work, then the injury was received while engaged in the service for which he was employed, but it was not properly inferable from the evidence that the contract actually embraced this transportation, there was a permissive privilege granted to the plaintiff, of which he availed himself to facilitate his labor and service, and was connected with it, and the relation of master and servant existed.

Following the line of reasoning in the aforementioned cases, I am of the opinion that the petitioner is entitled to receive compensation in accordance with the prayer of the petition.

\*    \*    \*    \*    \*    \*    \*

W. E. STUBBS,
*Deputy Commissioner...*